**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TOM FORTUNATUS,

Plaintiff,

- v -                                         Civ. No. 8:12-CV-458
                                                          (RFT)

CLINTON COUNTY, NEW YORK and
JOSEPH GIROUX, *in his Official Capacity as*
*Clinton County Treasurer and in his Individual Capacity*
Defendants.

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

### MEMORANDUM-DECISION and ORDER

On August 1, 2012, this Court issued a Discovery Order, permitting, *inter alia*, Fortunatus an opportunity to depose James Langley, Chair of the Clinton County Legislature. Dkt. No. 15, Dec. & Order. In anticipating that there may be disagreement regarding the scope of the interrogation, particularly regarding matters discussed during an executive session of the County Legislature, the Court granted the parties an opportunity to submit briefs as to whether those discussions are privileged or could be subject to inquiry. Rather than promptly filing briefs on this matter with the Court, the parties apparently engaged, albeit unsuccessfully, in further discussion on the parameters of the depositions. Realizing that their disagreement requires a judicial resolution, the Court granted Fortunatus permission to file a motion to compel. Dkt. No. 17, Order, dated Aug. 22, 2012.

On August 27, 2012, Fortunatus filed his Motion to Compel seeking an order

preventing Chairman Langley from refusing to answer questions during his deposition by asserting a privilege; he also seeks an award of attorney fees. Dkt. Nos. 18-21.[1] Defendants oppose the Motion. Dkt. No. 22.

# I. BACKGROUND

## A. The Nature of the Litigation

Briefly, Fortunatus owned a house in Clinton County which the County took by a default judgment for tax foreclosure in March 2011. While away in Uganda recovering from an illness, a notice of foreclosure was forwarded to his residence by certified mail, which was accepted by his neighbor, Shirley Davis, and, on March 21, 2011, New York State County Judge McGill signed an order and judgment of tax foreclosure against Fortunatus, transferring title of the property to Clinton County. Fortunatus became aware of the foreclosure upon his return to Clinton County in April 2011. Three months later, the property was sold at a public auction on June 2, 2011. *See generally* Dkt. No. 1, Compl.

After the sale, Fortunatus discovered that another landowner, whose property was subject to foreclosure action at about the same time, was allowed to redeem his property through a private sale. Fortunatus alleges that this landowner, Mark Liberty,

---

[1] Presumably because of the volume of Fortunatus's submissions, said Motion was filed under four different docket numbers. Dkt. No. 18-21. In doing so, Mark Schneider, Esq., unnecessarily filed his Affidavit, dated August 24, 2012, in triplicate. *See* Dkt. No. 19, 20, & 21. Notwithstanding the duplication, attached to each Affidavit is a different set of Exhibits.

was allowed to personally appeal to the entire Clinton County Legislature and to enter into settlement with the County for a reconveyance of his property, wheras he was denied a similar opportunity to speak with the Legislature and/or redeem his property. Fortunatus alleges that because he is a black man, Defendants deprived him of his property without due process and equal protection of the law. *See generally* Compl.

More saliently, Fortunatus contends that the Defendants have not provided a plausible explanation why they returned Mr. Liberty's property for payment of back taxes but would not extend him the same courtesy. Absent a plausible explanation, Fortunatus posits that Defendants discriminated against him because of his race. For this reason, Fortunatus wants to explore what, if anything, was discussed during the Clinton County executive session relative to settling Liberty's litigation and allowing him to redeem his property. *See generally* Dkt. No. 18, Mot. to Compel, dated Aug. 27, 2012. Defendants asserts that those discussions, if any, are privileged under New York Public Officer's Law § 105, and moreover, are not relevant to this litigation. *See generally* Dkt. No. 22, Defs.' Opp'n.

Contrary to the resolution of most discovery matters, which are usually succinct and prompt, a decision in this matter defies a laconic ruling and cannot be rendered resting solely on the allegations within the Complaint. Indeed, further history is required in order to put into context the exact nature of this specific discovery demand

and an understanding of the opposition thereto.  Context necessitates the Court to delve into the underlying sequence of events of both Liberty's and Fortunatus's foreclosures.

## B.  Mark Liberty's Foreclosure Action

As the submissions reveal, Liberty's wife, who was ill, had not told him that the real property taxes had not been paid nor that she had received a notice of foreclosure. By the time Liberty learned of the foreclosure, the deadline for redemption of property had expired and the County Treasurer's Office had informed him that an offer to pay the taxes was too late.  Dkt. No. 22, Robert Rausch, Esq., Aff., dated Aug. 31, 2012, at ¶ 17.  In order to forestall the sale of the property, Liberty filed a motion to vacate the foreclosure, maintaining that the County should accept his late offer of payment prior to the auction of the property.  Liberty and the County appeared before Judge McGill, whom ultimately ruled that the foreclosure process was valid and that Liberty's hardship was not a legitimate basis to set aside the foreclosure.  *Id.* at ¶ 18; Dkt. No. 22-1, Ex. G, Liberty Hr'g. Tr., dated May 31, 2011.  During this Hearing, the parties debated whether New York Real Property Tax Law § 1166 gave the County Legislature authority to allow private sale of tax foreclosed properties.[2]  *See generally*

---

[2]  New York State Real Property Tax Law § 1166 states that

(1) [w]henever any tax district shall become vested with the title to real property by virtue of a foreclosure proceeding brought pursuant to the provisions of this article, such tax district is hereby authorized to sell and convey the real property so acquired, either with or without advertising for bids, notwithstanding the provisions of any

(continued...)

*-4-*

Liberty Hr'g. Tr. Liberty contended that § 1166 provides the Clinton County Legislature with the authority to reconvey the property back to him, while the County argued that by virtue of this statute only the County Treasurer, Defendant Giroux, who is the enforcement officer, has the authority to license such a private reconveyance. *Id.* at pp. 4-7. It is uncertain when Liberty may have appeared before the County Legislature, or whether he was invited or just permitted to address the legislature upon his request, but his appeal for a private sale of his property was rejected. Rausch Aff. at ¶ 19; Liberty Hr'g. Tr., at p. 6.

Assessing the County's position as to whom it believes has the ultimate power to make a decision relative to a private sale, Judge McGill asked:

> So is it an Article 78 proceeding against Mr. Giroux that's required? Has he made the wrong decision? . . . So you have an Article 78 proceeding against Mr. Giroux, right? He's the one that if that's the case, he's the controlling entity, is he not?

---

[2](...continued)
general, special or local law. (2) No such sale shall be effective unless and until such sale shall have been approved and confirmed **by a majority vote of the governing body of the tax district**, except that no such approval shall be required when the property is sold at public auction to the highest bidder. (emphasis added).

Under Real Property Tax Law § 1166, a taxing district is not required to sell foreclosed property at public authorization; private sales are contemplated as well, if there is a majority vote of the governing body of the tax district. *First Nat. Bank of Downsville v. Atkin*, 183 Misc.2d 425, 427 (N.Y. Sup. Ct. 2000). Furthermore, there is no authority stating that a property owner who fails to redeem property prior to the foreclosure is precluded from subsequently purchasing that property back from the taxing district, if the requisite approval can be secured from the Board. *Id.*

Liberty Hr'g Tr. at pp. 7-9.

Presumably provoked by this exchange between the Court and the parties, Liberty

opined that he would commence an Article 78 proceeding before the end of that day,

a promise he consummated. *Id.* at p. 12; Dkt. No. 22-1, Ex. H, *Liberty v. Clinton

County* Verified Pet., dated May 31, 2011. Immediately upon receiving Liberty's

Article 78 petition, Judge McGill removed Liberty's property from the public sale

slated for June 2, 2011. Dkt. No. 20-1, *Liberty v. Clinton County* Order to Show

Cause, dated May 31, 2011, at p. 2. Shortly thereafter, before this Article 78 was

decided, Liberty and Clinton County entered into a settlement agreement whereby

Giroux, as the County Treasurer and enforcement officer, agreed to ask the County

Legislature to consider a reconveyance of Liberty's property. Rausch Aff. at ¶ 20;

Dkt. No. 20-5, Liberty Settlement Agreement, dated July 25, 2011.[3] On July 13, 2011,

---

[3] The parties to the Settlement Agreement agreed that the County Treasurer, as the statutory enforcing officer, had the "sole authority to determine whether or not to consider a private sale of a parcel of land acquired by the County through the tax foreclosure process subject to approval by the County Legislature." Dkt. No. 20-5, Settlement Agreement, dated July 25, 2012, at p. 3.

As discussed further herein, Defendants contend that the County decided to grant the private sale to Liberty solely to avoid a legal precedent and the cost of litigation. Rausch Aff. at ¶ 21; Dkt. No. 22-1, Ex. I, Giroux Dep., dated June 27, 2012, at pp. 13, 34, & 35-36; Dkt. No. 21-1, Joseph Giroux Dep., dated June 27, 2012 (this deposition is the same as Ex. I, however, more pages are cited); *see infra* Part II. Furthermore, to the extent county officials could recall, this was the only private sale or non-auction sale of County foreclosed property in Clinton County. Joseph Giroux Dep., at pp. 29-32 & 46-47; Dkt. No. 21, Mark Schneider, Esq., Affirm., dated Aug. 24, 2011 at ¶ 11 ("Defendants told Mr. Fortunatus (and many others) that under no circumstances would they reconvey tax-acquired property after the date of the foreclosure order.")

upon Giroux's and Liberty's presentations, the Clinton County Legislature promulgated a resolution, based upon Real Property Tax Law § 1166, granting the private sale and, upon receiving monetary consideration, a deed was issued to Liberty. Rausch Aff. at ¶ 21; Dkt. No. 20-4, Clinton County Res., dated July 13, 2011.

### C. Tom Fortuntas's Foreclosure Action

Fortunatus was in Uganda from 2010 to 2011. While he was out of the country, and apparently at the same time Liberty's property was being foreclosed, Clinton County commenced a foreclosure action against Fortunatus's property. Dkt. No. 20, Mark Schneider, Esq., Affirm., dated Aug. 24, 2012, at ¶ 2; *see also* Dkt. Nos. 19-2 & 22-1, Ex. B, Foreclosure Notice, dated Oct. 8, 2010, & 19-3, Tax Bill. Fortunatus's neighbor and designee, Shirley Davis, accepted the certified mail, Dkt. No. 22-1, Ex. C, and, on March 18, 2011, Judge McGill issued an Order of Foreclosure, Dkt. No. 22-1, Ex D. Upon Fortunatus's return in April 2011, he was alerted of the foreclosure. Dkt. No. 22-1, Ex. A, Fortunatus Dep., dated June 4, 2012, at pp. 21-23. Like Liberty, when Fortunatus approached the Treasurer's Office to supplicate for repurchase of his property, his overtures were declined and he was advised that his only recourse was to recoup his property at public auction. Rausch Aff. at ¶ 9. The Complaint indicates that Fortunatus made these importunes after his property was sold at auction and after discovering Liberty's successful efforts to redeem his property. *See supra* Part I.A;

Schneider Affirm. at ¶ 23 ("In September 2011, Mr. Fortunatus learned of the reconveyance of the Liberty property."). The record is somewhat muddled as to exactly when Fortunatus may have approached several legislators regarding a personal appeal to the Legislature at-large for a reconveyance, or exactly what those Legislators may have said to him regarding that possibility.[4] Nonetheless, Fortunatus did not appear before the County Legislature, did not attempt to redeem his property at the auction, and did not initiate formal legal action on this matter until four months after the auction sale of his property. Rausch Aff. at ¶¶ 12-13, & 22; Fortunatus Dep. at pp. 26, 41, 45, 49, & 55. Similarly, Fortunatus commenced an Article 78 action asserting a denial of due process and equal protection. By a Decision and Order, dated February 24, 2012, Judge McGill denied Fortunatus's Article 78 proceeding, and the matter is currently on appeal. Dkt. No. 22-1, Ex. F, Dec. & Order; Schneider Affirm. at ¶ 24. And, as the record evinces, the County refuses to settle with Fortunatus and reconvey his property. Schneider Affirm. at ¶¶ 24 & 48; Rausch Aff. at ¶¶ 22.

### D. Prior Discovery

---

[4] Fortunatus spoke with three County Legislators about the possibility of him addressing the County Legislature about redeeming his property. Dkt. No. 22-1, Ex. A, Fortunatus Dep., dated June 4, 2012, at pp. 40-41, & 43. There is agreement that they discussed Fortunatus's misfortunes, however, probably due to faded recollections, neither Fortunatus nor County Legislator Rowden could precisely recall whether he was told that he could or could not attend a legislative session to make an appeal for his property. om Fortunatus Dep., dated June 24, 2012, at pp. 35 & 40-49; Ex. E, Sara Rowden Dep., dated June 27, 2012, at pp. 7, 8, 9, 14, & 15; Dkt. No. 24-1, Tom Fortunatus Dep. Errata Sheet. Nonetheless, Fortunatus did not appear before the Legislature.

To be clear, Fortunatus has not been foreclosed from receiving discovery relative to the Liberty foreclosure and subsequent reconveyance. Fortunatus has been provided with a copy of Liberty's Settlement Agreement. Dkt. No. 20-5. He has received multiple documents such as court transcripts, pleadings, and decision and orders revealing the sequence of legal events and consequences that led to Liberty's Settlement Agreement. Also disclosed was Clinton County Legislature's Resolution number 566 explaining that, in reconveying property to Liberty, the Legislature was acting upon the recommendation of the County Treasurer and "in the best interest of the County." Dkt. No. 20-4. And, Fortunatus has interviewed and deposed numerous County officials on this very issue.

In spite of all that has been disclosed thus far on the subject, Fortunatus remains unsatisfied and wishes to penetrate deeper into every layer with the hope that buried within the "machination" of this Settlement Agreement is a more sinister motive or plot to discriminate against him.

County Legislator Sara Rowden averred that the decision to enter into a private sale rests with the County Treasurer; when Liberty and another taxpayer appeared before the Legislature, that public body did not approve the private sale primarily because it did not want to set a precedent; the Legislature continued to look at the issue over several meetings, including an executive session; and, ultimately, upon

recommendation from the County Treasurer, the Legislature agreed to a private sale to Liberty to avoid further costly litigation. Dkt. No. 22-1, Ex. E, Sara Rowden Dep., dated June 27, 2012, at pp. 11-15. Similar inquires were made of County Legislature John Gallagher. *See generally* Dkt. No. 22-1, Ex. J, Gallagher Dep., dated June 27, 2012. Succinctly, he testified the he knew of only one taxpayer, Liberty, who appeared before the Legislature, and where the County Treasurer, the ultimate authority for reconveyance, recommended the settlement; and, the Legislature has not settled with Fortunatus because the County Treasurer has not made such a recommendation. *Id*. at pp. 6, 7, & 10. Gallagher also testified that nothing happened during their executive sessions. *Id*. at p. 7.

The most revealing deposition was that of Defendant Joseph Giroux. Dkt. No. 22-1, Ex. I, Giroux Dep., dated June 27, 2012; *see also* Dkt. No. 21-2 (same with additional pages). Giroux testified that, other than following state law, the County does not have a written policy regarding reconveying property after the County acquires it during a tax foreclosure, and, accordingly, he initially refused to settle with Liberty. *Id*. at pp. 13, 23-25, 30-32, & 50. With the exception of Liberty, others who sought reconveyance have been denied. *Id*. at pp. 30-31. Giroux opined that neither he nor the Legislature had the authority to reconvey property acquired through a tax foreclosure. *Id*. at pp. 27 & 36. However, because of Judge McGill's rulings

intimating that the County could conduct a private sale on the advice of the County Treasurer, along with the notion that further litigation initiated by Liberty would cost the County significantly, and realizing the Legislature's leaning toward a private sale for Liberty, Giroux yielded, agreed to the sale, and made the recommendation to the County Legislature. *Id*. at pp. 13, & 34-35. When asked why he did not enter into a similar settlement with Fortuantus, Giroux testified that because of current and previous tax history with Fortunatus, he could not change their policy or practice. *Id*. at pp. 44 & 46.

Lastly, Defendants' Counsel advised Fortunatus that the "County agreed to settle the Liberty claim in an effort to avoid costs and potentially harmful precedent . . . . [and] [t]hat settlement could be effectuated because the litigation transpired before the foreclosure auction occurred." Dkt. No. 11, Robert Rausch Esq. Lt., dated July 30, 2012, at p. 1. Furthermore, Counsel reiterated the reason why the County would not entered into a settlement with Fortunatus. *Id*. at p. 2.

Taking into account that Fortuantus has already learned from four County officials and Defendants' Counsel as to why the County settled with Liberty,[5] and weighing all of the other relevant discovery that has been provided and connected to

---

[5] Even Liberty's Counsel, Justin Meyers, was deposed and essentially stated that he had no knowledge as to why Clinton County settled with Liberty. Dkt. No. 12, Thomas W. Plimpton, Esq., Lt.-Br., dated July 31, 2012 (citing Meyers Dep., dated June 27, 2012, at p. 11).

this issue, it would certainly appear that any further discovery would be cumulative. However, because James Langley, Chair of the Clinton County Legislature, signed the Settlement Agreement, the Court relented and permitted this final deposition on this matter. But the boundaries of that inquisition could not be agreed upon by the parties. The Defendants do not object to producing Langley for deposition, but rather object to the breadth and extent of the interrogation, which, as we now know, contemplates piercing state law privileged communications that occurred during an executive session with the Legislative Counsel present.

## II. DISCUSSION

In New York, all public meetings are open except for executive sessions. N.Y. PUB. OFF. LAW. § 103(a). "Upon a majority vote of its total membership, taken in an open meeting . . [and] identifying . . . the subject [matter] to be considered, a public body may conduct an executive session for the below enumerated purposes only, . . . [including] discussion regarding proposed, pending or current litigation." *Id.* at §§ 105(1) & (1)(d); *see also* N.Y. PUB. OFF. LAW § 102(3). It is clear in New York that discussions that occur in an executive session, which may also include privileged attorney-client communications, are not the type of government records or discussion to which the public has been historically and statutorily given access to. *Kline & Sons v. Cnty. of Hamilton*, 235 A.D.2d 4 (N.Y. App. Div. 3d Dep't 1997) (rejecting the use

of a FOIL request to obtain discussion during an executive session). If the discussion concerns pending litigation, "it is clear that [a] board [has] the right to meet in executive session." *Matthes v. Town of East Fishkill*, 785 F.2d 43, 45 (2d Cir. 1986).

Here, the County Legislature held an executive session to discuss Liberty's pending Article 78 litigation, with William Favreau, Esq., the Legislature's Counsel, and possibly Robert Rausch, the County's litigation Counsel. In light of statutory and common law privileges that cloaked this executive session, Defendants will not permit Fortunatus to interrogate Chairperson Langley on those discussions transpiring during one or maybe more executive sessions. Notwithstanding the clear intent of the law by virtue of both the statute and corresponding case precedent, Fortunatus argues that this Court should draw back the veil of executive session secrecy and allow him to question Langley in depth about the executive sessions as well as dismiss and/or seriously discount any claim of attorney-client privilege or work product doctrine. More directly, Fortunatus wants this Court to proscribe Langley from refusing to answer questions under any claim of privilege. Fortunatus contends that state law privileges are not applicable in federal question cases and discovery should rest solely on federal law. Accordingly, the issue before the Court is whether a state statutory privilege asserted in a federal question should prevail.[6]

---

[6] Fortunatus also wants this Court to decide if Clinton County faithfully abided by the open
(continued...)

State privileges are not absolute in federal court, especially when a federal question forms the basis for federal jurisdiction. Principally, where the litigation is based upon a federal question, *i.e.*, 42 U.S.C. § 1983, privilege claims are governed by federal rather than state law. *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (recognizing that in a federal action, "the federal law of privilege controls the question whether the privileges asserted by [a party] should be recognized"); *Komlosi v. New York Office of Mental Retardation and Dev. Disabilities*, 1992 WL 77544, at *2 (S.D.N.Y. Apr. 3, 1992) (noting that New York state law does not govern discoverability and confidentiality in federal civil rights actions); *Lizotte v. New York City Health and Hosp. Corp.*, 1989 WL 260217, at *2 (S.D.N.Y. Nov. 28, 1989) ("It obviously would make no sense to permit state law to determine what evidence is discoverable in cases brought pursuant to federal statutes whose central purposes is to protect citizens from abuses of power by state and local authorities."); *Van Emrik v. Chemung County Dep't of Social Servs.*, 121 F.R.D. 22, 24-25 (W.D.N.Y. 1988). However, when no federal common law creating a comparable federal privilege exists, the state created privilege may still be considered.

---

[6](...continued)
meeting provisions of § 105. He has repeatedly claimed that Clinton County acted improperly and possibly illegally in declaring an executive session. A challenge to the meeting and the motion to go into executive session is not within this Court's province to decide. If Fortunatus wants to register those complaints and challenges, he may do so under New York's Article 78. *See Roberts v. Town Bd. of Carmel*, 207 A.D.2d 404, 405-06 (N.Y. App. Div. 2d Dep't 1994).

Intuitively then, federal courts are required to engage in the following analysis: "[w]hile as a matter of comity federal courts accord deference to state-created privileges, . . . such privileges are construed narrowly, . . . and must yield when outweighed by a federal interest in presenting relevant information to a trier of fact[.]"[7] *United States v. One Parcel of Property Located at 31-33 York Street, Hartford, Conn.*, 930 F.2d 139, 141 (2d Cir. 1991) (citations omitted).  That is, "the policies underlying state evidentiary privileges must still be given serious consideration, even if they are not determinative."  *Daniels v. City of New York*, 2001 WL 228091, at *2 (S.D.N.Y Mar. 8, 2001) (citation omitted).

The Court need not engage in this balancing test if the decision-making process itself is the central and pivotal subject of the litigation.  *In re Supboena Duces Tecum on Office of Comptroller*, 145 F.3d 1422, 1425 (D.C. Cir. 1998) (discussing the

---

[7] The deference to be accorded to state created privileges under the principle of comity was previously stated in FED. R. EVID. 501:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

*von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (quoting the former version of FED. R. EVID. 501).

deliberative process privilege *vis-a-vis* the litigation); *Alleyne v. New York State Educ. Dep't*, 248 F.R.D. 383, 388 (N.D.N.Y. 2008) (citing *Children First Found., Inc., v. Martinez*, 2007 WL 4344915, at *7-8 (N.D.N.Y. Dec. 10, 2007) (surveying cases and discussing the implication of the qualified privilege of the deliberative process)); *accord Children First Found. Inc., v. Martinez*, 2008 U.S. Dist. LEXIS 120828, at *11 (N.D.N.Y. June 20, 2008) (decision making process is central issue in the litigation). However, where the decision-making process is either collateral or peripheral to the litigation, courts have balanced the interest of the litigants and the government's need to protect frank discussion or the process itself. *Alleyne v. New York State Educ. Dep't*, 248 F.R.D. at 388 n.2; *accord New York v. Salazar*, 701 F. Supp. 2d 224, 237 (N.D.N.Y. 2010).

Fortunatus intimates, based upon the precedents cited by him, that this Court may forego engaging in a balancing test. Defendants assert that precedents based upon the common law deliberative process privilege are not applicable to a statutorily created privilege, such as the executive session privilege. Although these privileges are derived from different sources, their common thread is that a specific governmental decision making process must be the core subject in the litigation in order to be discovered. Fortunatus argues then that the executive session dealing with Liberty "is the decision making process of Clinton County that is being challenged in this civil

rights lawsuit." Dkt. No. 18, Pl.'s Mem. of Law at p. 4.

The Court respectfully disagrees with Fortunatus's conclusion and finds that it is either misplaced or incorrectly expostulated. The essential allegation in the Complaint is that the Defendants refused to settle with Fortunatus and reconvey his house based upon racial discrimination.[8] Giroux testified that he would not consider settling with Fortunatus because of Fortunatus's errant tax payment history. Dkt. No. 21-1, Giroux Dep. at pp. 44-46. It is the Defendants' decision making process regarding Fortunatus, not Liberty, which is at stake in this litigation. And, such decision making rests predominately with the County Treasurer, Giroux, the ultimate enforcement officer, who has the authority to make a recommendation to the County Legislature as permitted by Real Property Tax Law § 1166.

Close examination of the case precedents highlights that disclosure of state privileged information is narrowly tailored to specific governmental action directed at a specific party to the litigation. Had there been an executive session regarding Fortunatus's effort to have his house reconveyed, this Court would readily agree with

---

[8] "To maintain an equal protection claim, plaintiffs were required to show 'adverse treatment of individuals compared with other similarly situated individuals [**and that**] such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Miner v. Clinton Cnty., N.Y.*, 541 F.3d 464, 474 (2d Cir. 2008) (quoting *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir. 2005) (emphasis added)). Though it is of nominal consequence regarding this Motion to Compel, Defendants dispute that Liberty and Fortunatus were similarly situated.

him, eschew engaging in any balancing test, and direct that this particular executive session, not Liberty's, be explored during Langley's deposition. But any executive session regarding Liberty or, for that matter, any other possible executive session pertaining to the scores of other tax payers who were likewise denied reconveyance after the issuance of orders of foreclosure are peripheral. Accordingly, the Court will continue with its analysis and weigh the factors pertinent to balancing the parties' interests with the policy to protect.

There are five factors to consider when conducting the balancing test:

(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*In re Subpoena Duces Tecum Served on Office of Comptroller*, 145 F.3d at 1424.

The third and fourth factors are obvious. Any equal protection claim is a serious matter and the claim of racial discrimination is directed at the role of government, specifically Clinton County and its Treasurer. The Court is not prepared to say, however, that the evidence sought is pivotal or controlling, although it may possess some remnant of relevance. But what does not weigh in Fortunatus's favor is the second element - availability of other evidence. Fortunatus has already received the same response from the County Treasurer and at least two County Legislators

regarding the Liberty executive session, has been furnished with the terms of the settlement along with the other relevant supporting documents, and, lastly, has been given the underlying reasons for the decision to settle. *See* Giroux Dep. at pp. 13, 34, & 37. Additionally, those reasons for settling Liberty's litigation have been confirmed by the County's Attorney, Robert Rausch. Rausch Lt., dated July 30, 2012. To put another county legislator through the same interrogation appears to be cumulative and superfluous.

The purpose of a closed executive session, pursuant to § 105(d), is to permit legislative bodies to discuss pending litigation with their attorney privately, without exposing its strategy to its adversary or the public. *Concerned Citizens to Review Jefferson Valley Mall v. Town Bd. of Town of Yorktown*, 83 A.D.2d 612, 613 (N.Y. App. Div. 2d Dep't 1981), *appeal denied* 54 N.Y.2d 957 (1981). There are obvious benefits to having a protected forum, such as a closed executive session, where unfettered discussion on a case or the ramifications of settlement can be realized. Historically, public access to settlement conferences and settlement proposals is virtually nonexistent. *United States v. Glens Falls Newspaper, Inc.*, 160 F.3d 853, 855 (2d Cir. 1998). To hold otherwise could result in some harm, possibly to an individual or the government itself in terms of its ability to perform its duties in the best interests of the public. "In a perfect world, the public would be kept abreast of all

developments in the settlement discussion of lawsuits of public interest. In our world, such disclosure would . . . result in no settlement discussions and no settlements." *Id.* at p. 856. Therefore, the most persuasive argument militating against an exploration of Liberty's executive session is the future timidity of legislators who will be forced to acknowledge that their discussions held in closed session on pending litigation are viable. Few cases would settle if the public had unmitigated privy to settlement discussions and proposals. *Id.* at 857. The Court must also take into further consideration that substantively compounding any effort to pry into the inner sanctum of this closed execution session are the very real and viable common law privileges of attorney-client and the work product doctrine, which are indeed recognized in federal question cases. Directing a legislator to testify openly about pending litigation discussed during executive session while counsel is giving advice and may also be sharing strategy, even if that strategy is to settle, would send an exponential chill over the entire decision making process.

In the final analysis, especially considering the pre-trial history in this case, the Court finds that the importance of this statutory protection significantly outweighs Fortunatus's effort to obtain cumulative evidence that the Court finds not keenly central to his claims of race discrimination and denial of equal protection. Accordingly, Fortunatus's Motion to Compel, Dkt. No. 18, is **denied** in all respects,

except Defendants shall provide a privilege log as to any other claims of privilege and Fortunatus may depose Langley and interrogate him on his personal knowledge and opinions as to both Liberty's and Fortunatus's situations, without seeking information regarding the Liberty executive session.

As to Fortunatus's Article 78 proceeding which was dismissed by Judge McGill, the Court has been apprised that there is an appeal pending in the Appellate Division. The parties are directed to file a status report when the Appellate Division has decided that appeal.

**IT IS SO ORDERED**.

October 2, 2012
Albany, New York


Randolph F. Treece
U.S. Magistrate Judge