# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

TOM FORTUNATUS,

                              Plaintiff,

        - v -                                        Civ. No. 8:12-CV-458
                                                          (RFT)

CLINTON COUNTY, NEW YORK and
JOSEPH GIROUX, *in his Official Capacity as*
*Clinton County Treasurer and in his Individual Capacity*
                        Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

Law Office of Mark Schneider              Mark A. Schneider, Esq.
*Attorney for Plaintiff*
57 Court Street
Plattsburgh, New York 12901

Maynard, O'Connor and Smith               Robert A. Rausch, Esq.
*Attorney for Defendants*
6 Tower Place
Albany, New York 12203

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## MEMORANDUM-DECISION and ORDER

Former Clinton County property owner Tom Fortunatus ("Fortunatus") initiated this action, pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated when Defendant Clinton County acquired his property through a tax foreclosure but would not consider reconveyance of his property after the date of redemption as it had done for another taxpayer. Dkt. Nos. 1, Compl. & 32, Am.

Compl. In essence, Fortunatus claims that the Defendants discriminated against him based upon race as well as a "class of one" equal protection claim and "denied [him] due process of law by not providing him with a hearing regarding his request for reconveyance of the tax acquired property." Am. Compl. at ¶¶ 75-79.

Presently before the Court are the parties' competing Motions for Summary Judgment. Defendants were the first to file a Motion for Summary Judgment. Dkt. No. 42, Defs.' Mot. for Summ. J, dated Nov. 27, 2012.[1] Shortly thereafter, Fortunatus filed a Cross-Motion for Summary Judgment, which, additionally in material respects, opposes Defendants' Motion. Dkt. No. 46, Pl.'s Cross-Mot. for Summ. J., dated Dec. 19, 2012.[2] Defendants filed an Opposition to Fortunatus's Cross-Motion, Dkt. No. 47,[3] to which Fortunatus filed a Reply, Dkt. No. 49.[4] For the

---

[1] Defendants' Motion for Summary Judgment is comprised of the following: Dkt. Nos. 42, Notice of Mot., dated Nov. 27, 2012; 42-1, Robert A. Rausch, Esq., Aff., dated Nov. 27, 2012; 42-2 - 42-32, Exs. A-EE; 42-33, Defs.' Mem. of Law; 42-34, Defs.' 7.1 Statement of Undisputed Facts (hereinafter "Defs.' 7.1 Statement"); and, 42-35, Joseph W. Giroux Aff., dated Nov. 19, 2012.

[2] Fortunatus's Cross-Motion for Summary Judgment is comprised of the following: Dkt. Nos. 46, Pl.'s Notice of Cross-Mot., dated Dec. 19, 2012; 46-1, Mark Schneider, Esq., Aff., dated Dec. 19, 2012; 46-2, Tom Fortunatus Aff., dated Dec. 17, 2012; 46-3, Pl.'s Resp. 7.1 Statement of Undisputed Facts (hereinafter "Pl.'s Resp. 7.1 Statement"); 46-4, Pl.'s Cross-Mot. 7.1 Statement of Undisputed Facts (hereinafter "Pl.'s 7.1 Statement"); 46-5, Exs.; and 46-6, Pl.'s Mem. of Law.

[3] Defendants' Opposition to Fortunatus's Cross-Motion is comprised of the following: Dkt. Nos. 47, Robert A. Rausch, Esq., Aff., dated Jan. 10, 2013; 47-1, Defs.' Reply Mem. of Law; and 47-2, Defs.' Resp. 7.1 Statements of Undisputed Facts (hereinafter "Defs.' Resp. 7.1 Statement").

[4] Fortunatus's Reply to Defendants' Opposition to his Cross-Motion is comprised of the following: Dkt. Nos. 49, Mark Schneider, Esq., Aff., dated Jan. 15, 2013; 49-1, Fortunatus Suppl.

(continued...)

foregoing reasons, the Defendants' Motion for Summary Judgment is **granted** and Fortunatus's Cross Motion is **denied**.

## I. BACKGROUND[5]

### A. Tom Fortunatus

Fortunatus, who owned property in the Town of Plattsburgh, County of Clinton, had a history of being late in paying his property taxes, had been a party to prior foreclosures, and, on a previous occasion, the property was actually foreclosed. On that occasion, Fortunatus initiated a state lawsuit to vacate the default judgment while he concomitantly commenced a federal action challenging the constitutionality of the redemption deadline and alleging that he was denied due process and equal protection. Dkt. No. 42-34, Defs.' 7.1 Statement at ¶¶ 17-18.[6] His litigation efforts were unsuccessful and he was required to redeem his property. *Id*.

For the tax years 2009 through 2011, Fortunatus did not pay his real estate taxes. *Id*. at ¶ 3. Fortunatus admitted to receiving most of the reminders, warning

---

[4](...continued)
Aff., dated Jan. 15, 2013; and 49-2, Pl.'s Reply Mem. of Law.

[5] Notwithstanding the series of Statements of Material Facts, *see* Dkt. Nos. 42-34, 46-3, 46-4, & 47-2, for the most part, the parties agree on the more salient facts and events.

[6] Both the state and federal litigations have been officially reported. *In re Foreclosure of Tax Liens by Clinton Cnty. (Fortunatus)*, 299 A.D.2d 774 (N.Y. App. Div. 3d Dep't 2002), *lv. app. dism*., 99 N.Y.2d 610 (2003), *rearg. den*. 100 N.Y.2d 616 (N.Y. Ct. App. 2003); *Zachary and Fortunatus v. Clinton Cnty*., 2003 WL 24197685 (N.D.N.Y. Jan. 10, 2003), *aff'd* 86 F. App'x 451 (2d Cir. 2004).

letters, and notices and was aware that he had not paid his property taxes. Dkt. No.
42-13, Ex. L, Fortunatus Dep., dated June 4, 2012, at pp. 11, 17-18, & 27; Dkt. Nos.
42-6 through 42-12, Exs. E-K (notices). Fortunatus had been sick for an extended
duration, and because of his illness, during September 2010, Fortunatus and his
daughter left for his native country of Uganda and did not return to Clinton County
until April 2011. Fortunatus Dep. at pp. 19-21 & 32; Defs.' 7.1 Statement at ¶¶ 7 &
12. In his absence from this Country, Fortunatus's neighbor, Shirley Davis, was
authorized by him to receive his mail. Fortunatus Dep. at p. 22. On October 8, 2010,
a Notice and Petition for Foreclosure was served at Fortunatus's address by certified
mail to which Ms. Davis accepted service by signing the certified mail receipt. *See*
Dkt. Nos. 42-14, Ex. M & 42-15, Ex. N. On March 18, 2011, New York State
Supreme Court Acting Justice Patrick McGill signed an order and judgment of tax
foreclosure on numerous properties, including Fortunatus's, transferring title of the
properties to Clinton County. Dkt. No. 42-18, Ex. Q. Three months later, on June 2,
2011, Fortunatus's property was sold at a public auction. *See generally* Am. Compl.

Upon his return from Uganda, Fortunatus was alerted that his property had been
foreclosed, so he reached out to the County's Treasurer Office in order to determine
how he could recoup his property. A woman in the Treasurer's Office advised
Fortunatus that the redemption deadline had expired and that his only recourse would

be to re-purchase the property at the auction. Fortunatus Dep. at p. 33; Defs.' 7.1 Statement at ¶ 13. Fortunatus and his attorney, Mark Schneider, Esq., reached out to several county legislators to see if he could have an audience with the Clinton County Legislature in order to make an appeal to regain his property; he also sought assistance from his United States Congressman. Fortunatus Dep. at pp. 35-48. Although he personally spoke with two county legislators[7] and Congressman Owen, receiving the same intelligence that, pursuant to County real property tax policy, his option was to re-purchase his property at auction, he never addressed the County Legislature nor did he appear at the auction on June 2. *Id*. at p. 41 & 49 (averring further that he did not have the resources to attend the auction); Defs.' 7.1 Statement at ¶ 21.

Approximately four months later, in September 2011, Fortunatus discovered that another landowner, Mark Liberty, whose property was subject to the same foreclosure order, was allowed to redeem his property through a private sale. Additionally, he learned that Liberty was allowed an opportunity to personally appeal

---

[7] Fortunatus claims that he spoke with County Legislator Sara Rowden. When asked if she may have shared with Fortunatus what Giroux may have said regarding the policy that the County does not reconvey property, County Legislator Sara Rowden stated that, "[she] could not recall [the conversation with Tom Fortunatus], but after speaking to Tom, [she] would have called Joe [Giroux] to find out what the issues were, yes. So, if he did call me back, than I would have responded with what I was told by the treasurer." Dkt. No. 42-20, Ex. S, Sara Rowden Dep., dated June 27, 2012, at p. 18. Fortunatus also spoke with County Legislator Harry McManus, Dkt. No. 42-21, Ex. T, Harry McManus Dep., dated June 27, 2012, while Fortunatus's Counsel, Mark Schneider, spoke with County Legislator John Gallagher, Dkt. No. 42-31, Ex. DD, John Gallagher Dep., dated June 27, 2012. None of these County Legislators are named as defendants herein.

to the County Legislature and eventually entered into a settlement with the County for a reconveyance of his property. Fortunatus Dep. at pp. 51-54; Defs.' 7.1 Statement at ¶¶ 19 & 20. Afer failing to secure a settlement agreement with the County, Fortunatus, on October 3, 2011, initiated litigation in New York State Supreme Court, pursuant to C.P.L.R. Article 78, against Defendants Clinton County and Joseph Giroux, alleging that he was entitled to a hearing before the County Legislature, the County and Giroux acted arbitrarily and capriciously, and their actions against him were discriminatory. Dkt. No. 42-22, Ex. U, Pl.'s Art. 78 Pet.

## B. Mark Liberty

Likewise, Mark Liberty's real property taxes had not been paid timely. Liberty's wife had received a notice of foreclosure but failed to inform Liberty. Their property was foreclosed pursuant to the same March 18, 2011 Order. Dkt. No. 42-18, Ex. Q. By the time Liberty learned of the foreclosure, the deadline for redemption of the property had expired and the County Treasurer's Office had informed him that his offer to pay the delinquent taxes was too late. Defs.' 7.1 Statement at ¶ 19. Responding to that instruction and after the County Legislature denied his request for a private sale, Liberty but before the property was auctioned, filed an Order to Show Cause to vacate the foreclosure judgment, and a hearing was held on May 31, 2011, before Justice McGill. *Id*. at ¶ 20; Dkt. No. 42-27, Ex. Z, Liberty Hr'g Tr.

During the hearing, the parties debated at length whether New York Real Property Tax Law § 1166 gave the County Legislature ultimate authority to allow private sales of tax foreclosed properties.[8] *See generally* Liberty Hr'g Tr. Clinton County posited that the County Treasurer, Defendant Giroux, who was the statutorily empowered enforcement officer, had the sole authority to permit a private conveyance. *Id*. at pp. 4-7.[9] Apparently, Liberty had previously approached the Legislature for a reconveyance under § 1166 but, based upon the advice of counsel, the County Legislature rejected his request. *Id*. at p. 6; Dkt. No. 46-5, Pl.'s Ex. 19,

---

[8] New York State Real Property Tax Law § 1166 states that

(1) [w]henever any tax district shall become vested with the title to real property by virtue of a foreclosure proceeding brought pursuant to the provisions of this article, such tax district is hereby authorized to sell and convey the real property so acquired, either with or without advertising for bids, notwithstanding the provisions of any general, special or local law. (2) No such sale shall be effective unless and until such sale shall have been approved and confirmed **by a majority vote of the governing body of the tax district**, except that no such approval shall be required when the property is sold at public auction to the highest bidder. (emphasis added).

Under Real Property Tax Law § 1166, a taxing district is not required to sell foreclosed property at public auction; private sales are contemplated as well, if there is a majority vote of the governing body of the tax district. *First Nat'l Bank of Downsville v. Atkin*, 183 Misc.2d 425, 427 (N.Y. Sup. Ct. 2000). Furthermore, there is no authority stating that a property owner who fails to redeem property prior to the foreclosure is precluded from subsequently purchasing that property back from the taxing district, if the requisite approval can be secured from the Board. *Id*.

[9] It was generally understood by the individual county legislators that this was the County's policy. Dkt. No. 42-20, Ex. S, Sara Rowden Dep. at pp. 5 & 12; Dkt. No. 42-21, Ex. T, McManus Dep. at pp. 8-9; Dkt. No. 42-31, Ex. DD, Gallagher Dep. at pp. 6, 9, 11; Dkt. No. 42-32, James R. Langley, Jr. (Chair of the Legislature) Dep., dated Nov. 1, 2012, at pp. 31-37, & 48; *see also* 42-19, Ex. R, Def. Joseph Giroux Dep., dated June 27, 2012, at pp. 27-30.

-7-

Clinton Cnty. Legis. Min., dated May 25, 2011, at p. 2.[10]  After the County Attorney

reiterated its position that the County Treasurer controls any private sale process,

Justice McGill inquired:

> So is it an Article 78 proceeding against Mr. Giroux that's required? Has
> he made a wrong decision? . . . So you have an Article 78 proceeding
> against Mr. Giroux, right?  He's the one that if that's the case, he's the
> controlling entity, is he not?

Liberty Hr'g Tr. at pp. 7-9.

Realizing that he did not have any further legal authority to grant Liberty's Motion to

direct a reconveyance of his property, Justice McGill denied Liberty's motion to

vacate the foreclosure.  Possibly prompted by Justice McGill's inquiry, Liberty's

counsel stated that they would file an "Article 78 proceeding before the end of today"

seeking to "pull[] the property out of the tax sale[.]"  *Id*. at p. 12.

On that very same day, Liberty filed yet another Article 78 Petition alleging that

both Giroux's actions and the County Legislature's non-action were arbitrary,

capricious, and abuses of discretion.  Dkt. No. 42-28, Ex. AA, Liberty Pet., at ¶¶ 13

& 28.  Noting that the public foreclosure sale was scheduled two days hence for June

2, 2011, Liberty pleaded that without court intervention his property would be sold

and he would be irreparably injured,  *id*. at ¶¶ 34-35, and, accordingly, sought a stay

---

[10] Fortunatus's Exhibits are lumped together in one filing.  *See* Dkt. No. 46-5.  Even though there is an index listing the Exhibits, each separate Exhibit is identified by a circled number located at the bottom of the page.  For our convenience, the Court will refer to those Exhibits by Fortunatus's designation rather than be guided by the Court's Electronic Court Filing enumeration.

and restraining order of the public sale of his property during the pendency of that action, *id*. at Wherefore Clause, ¶ C. On June 1, 2011, Judge McGill signed an Order to Show Cause removing Liberty's property from the public auction. Dkt. No. 20-1, Order to Show Cause, dated June 1, 2011, at p. 2.

Clinton County and Giroux filed an answer opposing Liberty's petition. *See generally* Dkt. No. 42-29, Ex. BB, Clinton Cnty. Ans. In addition to their answer, Giroux filed an affidavit in opposition stating, *inter alia*, that (1) "in [his] role as County Treasurer . . . , [he has] an obligation . . . to ensure that appropriate foreclosure procedures are followed;" (2) he and his predecessor "consistently declined all requests for a post-redemption deadline offers of payment;" (3) neither had "authorized the Legislature to approve a private sale of property back to a delinquent taxpayer;" (4) it would be "in the best interest of the County to deny Mr. Liberty's request;" and, (5) he had "exercised [his] discretion not to release the property back to Mr. Liberty and not to bring any proposal to the County Legislature[.]" Dkt. No. 46-5, Pl.'s Ex. 15, Joseph Giroux Aff., dated June 8, 2011, at ¶¶ 4-6 & 9.[11]

While Liberty's petition was pending before the State Court, he appeared before the Clinton County Legislature seeking a reconveyance of his property. On June 8,

---

[11] Additionally, Giroux advised the Court that on two separate occasions, the County initiated foreclosure actions against the Liberty property. Dkt. No. 46-5, Pl.'s Ex., 15, Giroux Aff., at ¶ 8.

2011, Liberty and his attorney appeared before the Legislature urging that this governmental body accept his overtures to settle his pending lawsuit. Dkt. No. 46-5, Pl.'s Ex. 18, Clinton Cnty. Legis. Min., dated June 8, 2011. Notwithstanding Clinton County's long-held policy not to engage in reconveyance of foreclosed properties, Pl.'s Ex. 15, on July 12, 2011, County Treasurer Giroux wrote a letter directly to the County Legislature stating that after reviewing the "proposed Settlement Agreement and Release" he "believe[s] the terms and conditions contained therein are in the best interest of the County" and recommends the issuance of a resolution authorizing the proposed private sale to Liberty. Dkt. No. 46-5, Pl.'s Ex. 13, Giroux Lt., dated July 12, 2011. Adhering to its policy that the ultimate decision regarding private sales of tax foreclosed properties resides within the province of the County Treasurer, in the resolution, dated July 13, 2011, the County Legislature noted that "the County Treasurer has recommended to the County Legislature . . . that in the best interest of the County, [Liberty's property] should be sold by means of a private sale[.]" Dkt. No. 46-5, Pl.'s Exs. 9, Clinton Cnty. Legis. Resolution, dated July 13, 2011, & 22, Clinton Cnty. Legis. Min., dated July 16, 2011. A final settlement agreement was executed and Liberty purchased his property from the County in the amount of $27,500.00. *Id.*, Exs. 10, Settlement Agreement, dated July 25, 2011,[12] & 31,

---

[12] As an integral provision of the settlement agreement, the parties agreed that the County

(continued...)

Quitclaim Deed, dated Aug. 4, 2011.

## C. Other Settlements

During this 2011 *in rem* proceeding, the County Treasurer's Office received numerous calls and letters from former property owners seeking to redeem their property after the foreclosures. Dkt. No. 46-5, Pl.'s Ex. 4, Taxpayer Notes. Those taxpayers and Fortunatus were treated alike; they were not allowed to redeem their property after Judge McGill's March 18, 2011 Order of foreclosure. Dkt. No. 42-19, Ex. R, Joseph Giroux Dep., dated June 27, 2012, at pp. 30-31; Dkt. No. 21, Mark Schneider, Esq. Aff., dated Aug. 24, 2011, at ¶ 11 ("Defendants told Mr. Fortunatus (and many others) that under no circumstances would they reconvey tax-acquired property after the date of the foreclosure order."). Apparently, Liberty is the only private sale or non-auction sale of a tax foreclosed property within Clinton County's history. Giroux Dep. at pp. 29-32 & 46-47. Other than Liberty, only two taxpayers, Fortunatus and Russell Pray, are reported to have engaged in litigation to challenge the County's policy decision. *Id.* at p. 30. Prior to their litigations in New York State

---

[12](...continued)
Treasurer is the statutory enforcing officer on the collection of real property taxes, pursuant to New York Real Property Tax Law § 1102, and "has sole authority to determine whether or not to consider a private sale of a parcel of land acquired by the County through the Tax foreclosure process . . . shall request the Legislature to consider approval of [the] private sale . . . [and noting that] this Agreement does not compel the Clinton County Legislature to authorize a private sale of the property to [Liberty]." Dkt. No. 46-5, Pl.'s Ex. 9, Settlement Agreement, dated July 25, 2011, at ¶¶ 2-4.

courts, both sought to negotiate with Defendants but their overtures were rejected.[13] With respect to Fortunatus's Article 78 petition, the Honorable Robert J. Muller, New York State Supreme Court Justice, issued a decision and order finding that Fortunatus failed to demonstrate his entitlement to the relief requested and dismissed the petition on the merits. Dkt. No. 42-24, Dec. & Order, dated Feb. 21, 2012.

## II. SUMMARY JUDGMENT LEGAL STANDARD

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil

---

[13] In addition to adhering to the County's policy not to allow redemption after the tax foreclosure, Giroux outlined his reasons for not negotiating with Fortunatus as follows: "He bought his house back one time at a County auction and he had lost it again and I was not recommending any changes in the procedure . . . . [W]ith the previous history and the current history – the previous history that he had bought his house back one time and that he had defaulted on it – I could not see myself changing nor did I have the right." Giroux Dep. at pp. 44-46. Even though Mr. Pray appeared before the County Legislature at about the same time as Liberty, the Legislature did not entertain his request for a reconveyance, and his property was sold at the June 2, 2011 auction. Dkt. No. 42-32, Ex. EE, James R. Langley Dep., dated Nov. 1, 2012, at pp. 26-28 & 30.

Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora*

*Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of

law, against it . . . [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d at 1461.

## III. ANALYSIS

### A. Collateral Estoppel

As mentioned above, on October 3, 2011, Fortunatus filed an Article 78 petition with the New York State Supreme Court against the Defendants for failing to reconvey his property back to him as they did with Liberty and seeking payment for the full value of his house. Dkt. No. 42-22, Ex. U, Pl.'s Art. 78 Pet. Fortunatus claimed that Clinton County and Giroux arbitrarily and discriminatorily refused to conduct a hearing and consider returning his property for the payment of back taxes and thus abused their respective discretion. *Id*. at ¶¶ 40-42. After the parties submitted additional affidavits and memoranda of law, New York State Supreme Court Justice Robert J. Muller dismissed Fortunatus's Article 78 petition. Dkt. No. 42-24, Ex. W, Art. 78 New York Dec. & Order, dated Feb. 21, 2012. First, when addressing Fortunatus's charge that he was treated differently from Liberty, and after stating the legal standard for an equal protection claim, Justice Muller, outlining the various differences between the two, found that "the record amply demonstrates that [Fortunatus] and Liberty were not in all relevant respects alike." *Id*. at pp. 4-5. Next, Justice Muller found that Fortunatus's claim that he was arbitrarily denied a right to

a hardship hearing was without merit and noted that the Defendants had "no duty to hold a hardship hearing." *Id*. at p. 5 (citing *Zachary v. Clinton Cnty*., 2003 WL 24197685, at *4 (N.D.N.Y. Jan. 10, 2003), for the proposition that the County was not required to permit redemption after the expiration of the deadline).

Because of this prior disposition, Defendants pled in their Answer three affirmative defenses that raise collateral estoppel or, at least, issue preclusion barring Fortunatus from re-litigating certain issues and facts. Dkt. No. 34, Ans., at ¶¶ 22-24.[14] When addressing the matter of issue preclusion and arguing that the New York State Court's findings "should be adopted" here, Defendants referred to the doctrine as either " the law of the case," or *res judicata.* Dkt. Nos. 42-33, Defs.' Mem. of Law at p. 15, & 47-1, Defs.' Reply Mem. of Law at p. 2. The law of the case doctrine is a seminal principle of law that falls within the family of preclusive effect. "[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *DiLaura v. Power Auth.*, 982 F.3d 73, 76 (2d Cir. 1992) (quoting *In re PCH Assocs.*, 949 F.2d

---

[14] Specifically, these affirmative defenses state the following: Twelfth Affirmative Defense (¶ 22), "the issues set forth in this lawsuit have already been raised before the New York State Supreme Court and a decision of that Court is entitled to collateral effect and is binding upon the plaintiff;" Thirteenth Affirmative Defense (¶ 23), "Plaintiff is barred from re-litigating claims due to the principles of issue preclusion;" and Fourteenth Affirmative Defense (¶ 24), "that the plaintiff have [sic] previously chosen New York State County Court and Appellate Division as the venue for resolution of these issues, and is barred from re-litigating his claim in Federal Court." Dkt. No. 34.

585, 592 (2d Cir. 1991)); *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d Cir. 1996). "While the doctrine is ordinarily applied in later stages of the same lawsuit, it also has application to different lawsuits between the same parties." *In re PCH Assoc.*, 949 F.2d at 592 (citations omitted). Reliance upon this later statement of law may have confounded Defendants in mis-stating the applicable doctrine for our case. The Court could not find any precedent stating that the law of the case doctrine applies wherein a previous ruling from a state court would be applied to a subsequent federal case. Setting aside the confusion, however, it is understood that the doctrine of issue preclusion, commonly described as collateral estoppel, is being invoked here because the Court asked the parties to address whether this action would be affected by the state court ruling and its pending appeal.[15] Even though Fortunatus, misconstrued the issue, as well, nonetheless he eventually challenges the applicability of issue preclusion in this litigation. Dkt. No. 46-6, Pl.'s Mem. of Law at pp. 37-39.[16]

---

[15] During a telephone conference held on November 27, 2012, the Court asked that this issue be briefed during the parties' respective dispositive motions.

[16] Fortunatus mysteriously deviated from the Court's direction and unfortunately discussed the matter of the absention doctrine, which is not relevant here. Dkt. No. 46-6, Pl.'s Mem. of Law at pp. 37-38. When the Court directed the parties to discuss the impact of the Article 78 ruling, the issue was narrowly drawn as issue preclusion. Absention doctrine notwithstanding, Fortunatus still responded to the Court's request by arguing that "claim preclusion generally does not operate to bar a § 1983 suit following the resolution of an Article 78 proceeding since the full measure of relief available in the former action is not available in the latter." *Id*. at p. 39 (quoting *Colon v. Coughlin*, 58 F.3d 865, 870 n.3 (2d Cir. 1995)). Misguidedly, Fortunatus has conflated issue preclusion with claim preclusion; they are two separate doctrines. Claim preclusion, also known as *res judicata*,
(continued...)

Pursuant to "the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must give state-court judgments the same preclusive effect as they would receive in courts of the same state." *Burkybile v. Bd. of Educ. Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)); *Giakoumelos v. Coughlin*, 88 F.3d 56, 59 (2d Cir. 1996) (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982)). In doing so, federal courts are "promot[ing] the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Allen v. McCurry*, 449 U.S. 90, 96 (1980).

Under federal law, a party is collaterally estopped from relitigating an issue if the following four-part test is met: "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'" *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir. 1998) (quoting

---

[16](...continued)
bars an action, while issue preclusion resolves already ruled upon issues and/or facts. *See Benjamin v. Traffic Exec. Assn' Eastern R.R.*, 869 F.2d 107, 111-12 (2d Cir. 1989) (discussing the difference between claim and issue preclusion and *res judicata* and collateral estoppel). Furthermore, *Colon v. Coughlin* dealt with whether a prisoner disciplinary hearing, given its procedural laxity, that was subsequently reviewed by an Article 78 proceeding on the substantial evidence standard, should ever be subject to collateral estoppel. *Colon v. Coughlin*, 58 F.3d at 869. The Second Circuit did not decide that issue, therefore *Colon* is inapposite.

*Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir. 1997) (further

citations omitted); *see also United States v. United States Currency in Amount of

$119,984.00, More or Less*, 304 F.3d 165, 172 (2d. Cir. 2002).[17]  Stated another way,

"[u]nder collateral estoppel, once a court decides an issue of fact or law necessary to

its judgment, that decision precludes relitigation of the same issue on a different cause

of action between the same parties. . . . It follows that, '[a]s compared to claim

preclusion, the rules of issue preclusion do not purport to prohibit litigation of matters

that never have been argued or decided.'" *Benjamin v. Traffic Exec. Ass'n E. R.Rs.*,

869 F.2d 107, 111-12 (2d Cir. 1989) (citations omitted); *see also Kremer v. Chem.

Constr. Corp.*, 456 U.S. at 467 n.6.  The party raising issue preclusion bears the

burden of showing that identical issue were presented in the previous case while the

party challenging collateral estoppel is obligated to show the absence of a full and fair

opportunity to litigate in the prior proceeding.  *Colon v. Coughlin*, 58 F.3d 865, 869

(2d Cir. 1995) (cited in *Toussie v. Cnty. of Suffolk*, 806 F. Supp. 2d 558, 571-72

(E.D.N.Y. 2011)).

New York law governs the preclusive effect of a court's Article 78 judgment.

*Blasi v. New York City Bd. of Educ*., 2012 WL 3307227, at *7 (E.D.N.Y. Mar. 12,

---

[17] Under New York law, similar factors are weighed when determining if collateral estoppel may apply.  *DiSorbo v. Hoy*, 343 F.3d 172, 182-83 (2d. Cir. 2003) (citing to New York law) (citations omitted).

2012). Under New York law, the doctrine of collateral estoppel applies to a prior Article 78 proceeding, precluding the relitigating in a subsequent action an issue clearly raised therein. *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 349-50 (N.Y. Ct. App. 1999). However, because an Article 78 court does not have the power to award the type of relief available in a § 1983 action, *res judicata* - a bar of the litigation - would not be applicable. *Vargas v. City of New York*, 377 F.3d 200, 205 (2d Cir. 2004). When, however, the issue in question was actually and necessarily decided in a prior proceeding and a party had a full opportunity to litigate the same issues being presented in a § 1983 action, the findings within a New York State Article 78 proceeding may have collateral estoppel consequence. *Constantine v. Teachers College*, 448 F. App'x 92 (2d Cir. 2011). Once a party chooses to litigate his claims by way of an Article 78 proceeding, he assumes the risk of collateral estoppel being applied in a subsequent proceeding such as a § 1983 action. *Giakoumelos v. Coughlin*, 88 F.3d 56 (2d Cir. 1996) (applying collateral estoppel to a previous Article 78 judgment where the plaintiff failed to show that there were procedural deficiencies or a lack of an opportunity to litigate); *see LaFleur v. Whitman*, 300 F.3d 256, 275 (2d Cir. 2002) (citing *Giakoumelos*).

Here, Fortunatus chose first to litigate the very same issues resonating in this action in an Article 78 proceeding, which were actually and necessarily decided

adversely against him. In reaching its decision that Fortunatus and Liberty were not similarly situated, Justice Muller found that prior to any sale of his property, Liberty approached the County Legislature to request a private sale, litigated the matter compelling the Legislature to authorize the private sale, and eventually entered into a settlement on the property and the back taxes. Whereas, Fortunatus did not appear before the Legislature to request a private sale of his property, informal inquiries notwithstanding, and, more significantly, never took any legal action of any kind prior to the public auction of his property. When he did, it was months after his property was sold. Accordingly, Justice Muller found Fortunatus's "contention that he was denied equal protection of the law to be without merit," as he similarly found that Clinton County was not bound to provide Fortunatus with a "hardship hearing." Dkt. No. 42-24, Ex. W, Art. 78 Dec. & Order at pp. 4-5. These findings were necessary to adjudicate Fortunatus's Article 78 petition and Justice Muller's Decision and Order is a valid judgment.

Further, Fortunatus cannot gainsay that he had a full and fair opportunity to litigate his claims of denial of equal protection and due process. In addition to his lengthy petition, Fortunatus submitted sworn affidavits, exhibits, and a memorandum of law in support of his claims, all of which would substantiate a full opportunity to litigate. Though he has raised correctly that claim preclusion, *res judicata*, is not

applicable, he has not raised any procedural deficiency that would give this Court pause in exercising collateral estoppel. *Moccio v. New York State Office of Court Admin.*, 95 F.3d 195, 200 (2d Cir. 1996), *abrogated on other grounds by Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005).

As far as the Court knows, an appeal of the Article 78 judgment is pending. Yet, collateral estoppel is "not foreclosed because [a] New York Supreme Court decision was being appealed. . . . Under New York law, mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding." *DiSorbo v. Hoy*, 343 F.3d at 183 (internal quotation marks and citations omitted).[18]

Based upon the Decision and Order in the prior Article 78 proceeding,

_____

[18] In fact, New York courts have consistently held that pendency of an appeal does not prevent the use of a challenged judgment as a basis of collateral estoppel. *Franklin Dev. Co., Inc. v. Atl. Mut. Ins.*, 60 A.D.3d 897, 899 (N.Y. App. Div. 2d Dep't 2009); *Anonymous v. Dobbs Ferry Union Free Sch. Dist.*, 19 A.D.3d 522, 523 (N.Y. App. Div. 2d Dep't 2005) (citing *Matter of Amica Mut. Ins. Co.*, 85 A.D.2d 727, 728 (N.Y. App. Div. 2d Dep't 1981)).

However, contrary to the cited New York law, some courts have acknowledged that where there is an inability for appellate review or there has been no review, though an appeal is taken, collateral estoppel may not apply. *Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996). But, closer scrutiny of this proposition of law reveals that it rests solely on those incidences where a party does not have an opportunity to address by an appeal facts and issues prevalent in the prior proceedings. *Id.* (matter of probable cause in plaintiff's arrest which could not be appealed); *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986) (noting that a winning party may not appeal issues determined adversely, and as a consequence, that un-appealed issue may not be barred); *Jenkins v. City of New York*, 478 F.3d 76, 91 (2d Cir. 2007) (noting that because plaintiff's criminal charges were dismissed, he was precluded an opportunity to appeal issues relative to identity and a lineup, and therefore "such success in the criminal proceeding prevents invocation of collateral estoppel against him on this issue").

Fortunatus is estopped from relitigating the issues of denial of equal protection or that he was denied due process because he did not receive a hardship hearing.

## B. The Doctrine of Equal Protection of the Law

Fortunatus agrees that Defendants were not "legally *obliged* under the Real Property Tax Law [§ 1166] to reconvey his property to him after it took legal title by tax foreclosure." Dkt. No. 46-6, Pl.'s Mem. of Law at p. 16 (emphasis in the original).[19] Notwithstanding this concurrence, Fortunatus claims that he was denied equal protection of the law under three theories: (1) race discrimination; (2) "class-of-one"; and; (3) class membership. *Id.* at pp. 19-30. In the context of his first theory, Fortunatus is a black African.

---

[19] Fortunatus quotes extensively to the New York State Office of Real Property Services' ("ORPS") Opinon Letter, dated April 12, 1999. Here, the opinion letter confirms that "while a tax district is under absolutely no obligation to allow redemption between the expiration of the redemption period and the issuance of the foreclosure order, we believe it may do so if it determines that allowing redemption would be in the best interests of the tax district . . . [and] if it so chooses[.]" Dkt. No. 46-6, Pl.'s Mem. of Law at p. 17 (quoting the Opinion letter). But the remainder of the opinion does not inure to Fortunatus's benefit as he advocates:

> [I]f a tax district does choose to allow persons to redeem during the pre-acquisition window, it must be careful to extend this privilege to other similarly situated parties . . . . As a practical matter, a tax district which decides to follow such a policy should probably extend to all parties, **unless it has reasonable grounds for refusing to do so in specific cases (e.g., the owner has a history of failing to pay taxes on time). As long as the tax district has a rational basis for its distinctions it should be in a fairly strong position if a constitutional challenge should ever materialize**.

*Id.* (emphasis added).

As the record and further discussion will indicate, Clinton County did not adopt such a policy, notwithstanding allowing Liberty to re-purchase his property, and the Defendants had reasonable grounds in refusing to settle with Fortunatus.

## 1.  Race Discrimination

Even though this Court has found that Fortunatus is estopped from relitigating a violation of the equal protection law, I recognize that he did not specifically raise in his Article 78 proceeding, nor did Justice Muller precisely address, the denial of equal protection based upon race.  Whether Fortunatus had the opportunity to raise such a position, which failure arguably could invoke collateral estoppel as well, the Court will take the more prudential conservative route and discuss this claim in the context of this § 1983 action.

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (prohibiting government from "invidiously discriminating between individuals or groups").  In order to demonstrate a violation of the Equal Protection Clause, "[p]roof of racially discriminatory intent or purpose is required[.]"  *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 482 (1997) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)); *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012).  In this context, "discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an

identifiable group." *Hernandez v. New York*, 500 U.S. 352, 360 ( 1991) (internal

citations and quotation marks omitted, alterations in the original); *Hayden v. Paterson*,

594 F.3d 150, 162 (2d Cir. 2010) (quoting *Admin. of Mass. v. Feeney*, 442 U.S. 256,

279 (1979)).    Ultimately, the course of action must be traced to a racially

discriminatory purpose. *Batson v. Kentucky*, 476 U.S. 79, 93 (1986).  A party who

alleges an equal protection violation has the burden of proving the existence of

purposeful discrimination, that racial consideration played an integral role in the

course of action, *McClesky v. Kemp*, 481 U.S. 279, 292-93 (1987), and that similarly

situated persons have been treated differently, *City of Cleburne v. Cleburne Living

Ctr.,* 473 U.S. 432, 439-42 (1985) (cited in *Gagliardi v. Vill. of Pawling*, 18 F.3d 188,

193 (2d Cir. 1994).  Yet, it must be stated that the Fourteenth Amendment guarantees

equal laws, not equal results.  *Lewis v. Casey*, 518 U.S. 343, 375 (1996).

Fortunatus has failed to satisfy his burden that he was denied equal protection

of the law based upon race.    Rather, he has posited naked assertions of racial

motivation without justification and a presentation of any reasonably reliable facts to

support his conclusion. *See Yusuf v. Vassar College*, 35 F.3d 709, 713 (2d Cir. 1994)

(cited in *Boomer v. Bruno*, 134 F. Supp. 2d 262, 269 (N.D.N.Y. 2001)).  Without

demonstrative proof, whether direct or circumstantial, it is a preposterous position to

assail the reconveyance to Liberty as an act of discrimination against Fortunatus

because he was black.

Liberty's interaction with the Legislature *via* appearances at their meetings and through litigation are well documented, and there is no hint of racial favoritism or bias. No where in the record does Fortunatus indicate that either the Clinton County Legislature or Giroux made any of their decisions that affected him principally based upon his race, even as late as September 2011. If the Legislature held a discriminatory intent based upon race against Fortunatus, it would have had to occur when the Legislature, in July 2011, in exercising its discretion, based upon a recommendation from the County Treasurer, relented in its position and agreed to settle with Liberty to sell his property back to him. Assuming that the Legislature knew of Fortunatus's claim, which the record does not establish, it would have been at that moment, or immediately prior to, that the Legislature would have decided, based upon Fortunatus's race, to refuse to settle with him. Because the public auction was held on June 2, 2011, it would have been too late to allow Fortunatus to redeem his property. Otherwise, because Fortunatus neither met with the board nor filed a similar lawsuit, it is reasonable to conclude that this entire august body was unaware of Fortunatus and his quest for the re-sale of his property.

When asked during his deposition if Clinton County discriminated against Fortunatus because he was a black man, James R. Langley, Chair of the Legislature,

exclaimed that he "didn't even know he was black." Dkt. No. 42-32, Ex. EE, Langley Dep. at p. 59. Treasurer Giroux, who made the ultimate decision not to settle with Fortunatus, likewise, did not know that he was black. Dkt. No. 42-19, Ex. R., Giroux Dep. at pp. 44 & 51.[20] In fact, Giroux and Fortunatus had never formally met. *Id*. at p. 51. Even if Giroux or Langley knew that he was black, it would not alter the outcome. Fortunatus was treated the same as the dozens of other property owners - white and black, who lost their property in tax foreclosure. *See infra* Part III.B.3. Therefore race was not a factor in enforcing the County's policy.

Giroux would not agree to reconvey Fortunatus's property to him because of his perpetually poor tax payment history. Fortunatus had previously defaulted on his taxes and lost his house, obligating him to buy it back at a public auction and, now he knowingly failed to pay his property taxes for the years 2009 through 2011 causing him to lose his property once again. Because of Fortunatus's hapless payment history as well as Giroux's understanding of the redemption policy in Clinton County, Giroux would "not recommend[] any changes in the procedure," . . . nor "did [he] have the right." Giroux Dep. at p. 44 & 46. And, on a separately independent basis, Giroux

---

[20] Giroux did not learn that Fortunatus was black until a couple months prior to his June 27, 2012 deposition. Dkt. No. 42-19, Ex. R. Giroux Dep. at p. 51. Fortunatus challenges their ignorance of his race by incredibly suggesting that due to other events and litigation their attorney or their family members knew, and because of these personalities' knowledge, Giroux and Langley should have known as well. Pl.'s Mem of Law at p. 19-20.

agreed to settle with Liberty out of fear that Justice McGill might find that a private sale of tax foreclosed property was beyond his auspices and solely within the province of the County Legislature. In essence, he was attempting to avoid a costly litigation fight that may result in an unfavorable precedent. Both of these decisions are reasonable and racially neutral. The suggestion that when Liberty filed his Article 78 petitions the parties entered into a "pre-arranged scheme to allow the Defendants to discriminate against Mr. Fortunatus," is not only speculative, but desperately specious. *See* Pl.'s Mem. of Law at p. 20, n.11.

In yet in an abject and belated attempt to establish a denial of equal protection, Fortunatus shifts blame for his woes upon County Legislator Sara Rowden, who allegedly denied him a right to a "hardship hearing." Dkt. No. 42-13, Ex. L, Fortunatus Dep. & Errata Sheet at pp. 41 & 55; Dkt. No. 46-3, Pl.'s Resp. 7.1 Statement at ¶ 7.[21] Rowden was one of two Legislators that Fortunatus spoke with

---

[21] By stating that Rowden denied him a right to a hardship hearing, he is essentially stating that she acted affirmatively and intentionally. Actually, Fortunatus has expanded the pool of discriminating Legislators who told him that because of the County's policy the Legislature would not hear his request to get his property back, and accordingly denied him access to the Legislature. Dkt. No. 46-3 at ¶ 7. In his Response 7.1 Statement, Fortunatus said that "[n]either Sara Rowden nor Harry McManus told [him] that he could address the Legislature to request reconveyance. Rather, they told him that the Legislature would not hear his request[.]" *Id*. (emphasis added); Yet, Fortunatus's recent and ever evolving testimony and averments on this specific matter is deeply troubling to the Court. Such derived averments could be attributed to him unreasonably conflating being advised of the County's policy with his request to speak to the Legislature. Or, it could be afterthoughts to shore up his claims. This would not be the first time a court found Fortunatus's assertions to be disingenuous. Dkt. No. 42-24, Ex. W, Art. 78 Dec. & Order, at p. 3, n.2.

(continued...)

about seeking an opportunity to ask the entire Legislature to consider reconveyance of his property. If the Court was to accept this argument, which I do not, it is Rowden, and not Giroux or Clinton County, that discriminated against him. Yet in spite of her alleged personal involvement,[22] Fortunatus never amended his Complaint

---

[21](...continued)

Fortunatus originally testified that it was he that asked for a hearing and not the Legislators mentioning the possibility of such a presentation. Although Rowden had discussed the matter with Giroux and advised Fortunatus that there wasn't anything further she could do, she remained sympathetic to his plight and would support his request to address the Legislature. Dkt. No. 42-13, Ex. L, Fortunatus Dep. at pp. 37-40 & 69. During his deposition, he testified that he never asked McManus if he could conduct a hardship hearing, *id*. at p. 43, and when the opportunity presented itself, he never stated that Rowden definitively told him that the Legislature could not or would not hear him on his request. His reason for not addressing the Legislature was "[b]ecause [he] didn't get enough legislators to call on," which numerical requirement was based upon either his "impression" or advice from his counsel. *Id*. at pp. 41, 44-46, 49, 55 & 70. Based upon his sworn deposition testimony, no one definitively denied his request. Although Rowden and McManus may not have advised him of an option to appear before the Legislature, this does not translate into definitively telling him that the Legislature would not hear him.

Then, within his Errata Sheet to his deposition, he now introduces the proposition that when he learned of the County's policy from Rowden, he "considered this to be a formal denial," which is an unreasonable assumption. Fortunatus Dep. & Errata Sheet, referring to pp. 41 & 55. And years later, his Affidavit muddles the issue further. In one averment, it is all Rowden's fault for him not having an audience with the County; and yet in another, he "realized that it would be pointless to go to a Legislative meeting to ask for [his] property back for payment of [his] back taxes[.]" *See* Dkt. No. 46-2, Tom Fortunatus Aff., dated Dec. 17, 2012, at ¶¶ 40-45, 47, & 53. Either he made the decision not to appear or someone else made the decision for him; but it does not cut both ways.

Conversely, Rowden testified that when speaking with Fortunatus she would have shared with him the County's policy as expressed by the Treasurer, and she believes she would have told Fortunatus that "[y]ou can come to the legislature and speak to the legislature which is always open to any person in Clinton County." Dkt. No. 42-20, Ex. S, Rowden Dep. at p. 14. When addressing constituent's issue, such as Fortunatus's, McManus's "normal answer" would be to speak with his local legislator, who would have been Rowden. Dkt. No. 42-21, Ex. T, McManus Dep. at pp. 5-6 & 8.

[22] A critical element of a § 1983 action is personal involvement. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

to name her as a party.  Contrariwise, Fortunatus did not think that any of the Legislators that either he or his attorney, acting on his behalf, contacted had treated him differently because of his race.  Fortunatus Dep. at pp. 61-62.  Nor can he identify any suggestion or implication that race was a factor in his previous and current attempts to regain his property.  *Id*. at pp. 59-60.

Fortunatus cannot connect any of the County Legislature's and Giroux's decisions to an intentional discriminatory purpose.  There is no proof that these deicisonmakers selected a particular course of action in order to adversely affect him because he is black.  Remember, volition or awareness of such a consequence is not sufficient to establish an equal protection violation based upon race.   Furthermore, Fortunatus was treated the same as all other taxpayers who were similarly denied a reconveyance, with the exception of Liberty.  No reasonable jury could conclude that Fortunatus was discriminated against because of his race, and accordingly, Fortunatus's equal protection claim, based upon race, is without merit.

## 2.  Class of One

Although the archetypal equal protection claim is based upon being a member of a suspect class, such as race, the Supreme Court has recognized "class of one" claims, where the plaintiff must prove that he was intentionally treated differently from others similarly situated without a rational basis for the difference in treatment.

*Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Different treatment must be based upon "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Bizzaro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Within the Second Circuit, a "class-of-one" plaintiff must show an extremely high degree of similarity between himself and the person(s) to whom he compares himself. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citing *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)). To succeed in meeting this extremely high degree of similarity, "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Ruston v. Town Bd. of Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) (citation omitted). That is, proof must establish that the plaintiff was singled out for reasons that lack any reasonable nexus to a legitimate governmental policy. *Giammatteo v. Newton*, 452 F. App'x 24, 30 (2d Cir. 2011). Although the notion of similarly situated may often be a factual issue, where it is clear that no reasonable jury could find that the plaintiff and comparator were similarly situated,

a court could grant summary judgment. *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790-91 (2d Cir. 2007).

The Court does not find within this record sufficient evidence to sustain a "class-of-one" equal protection claim. Conversely, not only is Fortunatus estopped from presenting this claim, but the Court finds overwhelmingly that Fortunatus has not met the extremely high degree of similarity purportedly between him and Liberty. For the reasons decided by Justice Muller, and more, Fortunatus and Liberty were not similarly situated. Additionally, the Court finds that Clinton County had a legitimate governmental policy or reasons not to treat them the same.

Liberty went to considerable lengths to explore different avenues, including litigation, in seeking the return of his property. He initially filed an Article 78 to vacate the order of foreclosure, and subsequently filed a second Article 78 to have his property pulled from the public auction and to compel Clinton County to use Real Property Tax Law § 1166 to resell his property to him. Fortunatus did neither. Even though Fortunatus had an attorney helping him, significantly, he did not pursue any litigation prior to the public auction of his property, while Liberty vigorously pursued litigation prior to any possible sale of his property. When Fortunatus engaged in litigation, it was four months after the public auction when his property was sold, which is a material and relevant distinction. In this respect, Liberty and Fortunatus

were dissimilar.

Liberty actively pursued a discourse directly with the County Legislature, appearing approximately three times before them, whereas Fortunatus made no similar effort. Fortunatus Dep. at p. 41. A reason why Fortunatus did not appear before the Legislature was his erroneous belief that he had to persuade at least six Legislators in order to gain an audience with the entire Legislature. And after he and his agent had spoken to at least three Legislators and Congressman Owen, all of whom explained to him the County's policy on redemption and reconveyance, he made no attempt to reach out to anyone else or to the entire body. *Id*. at pp. 40, 44, & 46. Consequently, because of Liberty's aggressive and immediate litigation strategy, Liberty secured the recommendation of the Treasurer for the private sale, whereas Fortunatus did nothing to earn a similar recommendation.

Furthermore, Clinton County and Giroux had a legitimate state interest in settling Liberty's lawsuit and yet refusing to settle with Fortunatus, especially after his property had already been sold. In order for the Court to find otherwise, Fortunatus would have to show that there was no rational basis for any unequal treatment or that the denial of his belated application for the return of his property was motivated by animus. *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). The ruling in *Harlen Assocs.* is analogous in that the plaintiff was a

property owner who was denied a special permit to operate a convenience store while others were granted permits. The zoning board denied the permit because of the concerns for safety of school children and over future development in that area. In finding that the board had advanced a number of legitimate reasons for denying the plaintiff a special permit, the Circuit noted that "[a] decision can only be considered arbitrary for federal constitutional purposes where . . . it has no basis in fact." *Id*. at p. 501. Finding that the board was not motivated by ill will or malice and that there was a legitimate state interest in denying the permit, the Second Circuit agreed that there were no equal protection or due process violations. The same findings hold true here.

In reviewing the colloquy between Justice McGill and the parties' attorneys during Liberty's first Article 78 proceeding, there existed some uncertainty as to whether the Justice would find contrarily to Clinton County's long-held position that the Treasurer makes all decisions relative to tax foreclosure, including the private sale of tax foreclosed property, and decide that the Legislature had the sole right to determine whether these properties may be reconveyed. In light of Justice McGill lifting Liberty's property from the public sale and that court entertaining Liberty's second Article 78 petition, it was also not unreasonable for Giroux to believe that "further litigation would have cost the County more [and that he] could see that the

Legislature was leaning toward the 1166 private sale and [he] waived." Giroux Dep. at p. 34.[23] And it can hardly be said that the Defendants' decision to settle Liberty's case, when Fortunatus's claim were unknown, would constitute discriminatory intent.

No reasonable jury would find that the Defendants' policy decisions affecting Fortunatus had a discriminatory purpose and were arbitrary, irrational, and without factual basis.[24] Additionally, Fortunatus has not shown an extremely high degree of similarity between him and Liberty nor of their respective circumstances. *Toussie v. Cnty. of Suffolk*, 806 F. Supp. 2d 558 (E.D.N.Y. 2011) ("identical in all relevant respects"). The fact that both had experienced difficulties paying back taxes, which

---

[23] In fact, Giroux's fears were realized in a subsequent ruling by Justice McGill in the lawsuit of *Russell Pray v. Clinton County*. In a brief Decision and Order, Justice McGill "[o]rdered that while the Clinton County Legislature is free to consider any information they wish, there is no requirement that the Clinton County Treasurer make a recommendation as to [Pray's] offer to purchase real property pursuant to RPTL § 1166 in order for the Clinton County Legislature to take action upon said offer[.]" Dkt. No. 46-6, Pl.'s Ex. 20, *Russell Pray v. Clinton County et. al.*, Index No. 2012-786, Dec. & Order, dated June 4, 2012; Giroux Dep. at p. 40. This *Pray* Decision and Order is the first in New York on this exact issue. But Pray did not prevail in recovering his property because it had been sold at a public auction. Because of that occurrence, the New York State Supreme Court, Appellate Division Third Department found the appeal moot as well as whether Justice McGill's decision may have been erroneous. *Pray v. Clinton Cnty.*, 101 A.D3d 1567 (N.Y. App. Div. 3d Dep't 2012). This appellate decision is rendered eighteen months after Fortunatus's property was sold.

[24] Actually, the Second Circuit found Harlen's claims of animus to be speculative, conjecture, and that no reasonable jury could find that the Board's denial was either irrational or motivated by constitutionally impermissible considerations. *Harlen Assocs. v. Inc. of Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001). Fortunatus has not identified any personal animus toward him by the Defendants and, likewise, revels only in speculation and conjecture as to any personal reasons why Clinton County would not settle with him. Resting on his claim that the Defendants' decisions are mere pretext, without more, suffers from same infirmities as found in *Harlen*. *See* Pl.'s Mem. of Law at pp. 27-28

between the two of them is also a matter of degree, is not enough to overcome this burden of proof or resurrect Fortunatus's claim. Therefore, the Court holds that Fortunatus cannot state a valid equal protection claim based upon a "class-of-one."

### 3. Class Membership

Fortunatus explores yet another theory as to how he was denied equal protection of the law. As the record reflects, during the 2009 to 2011 tax years, or for any prior tax periods, no real property owner in Clinton County was allowed to redeem their property after foreclosure, except Liberty. Now, Fortunatus wishes to cast all of these other landowners as an independent class, including him, as being discriminated against by the Defendants. This claim is ironic in that with his prior theories of race and "class-of-one" discrimination, he was theoretically divorcing himself from all others similarly situated, and now he wants to be all inclusive.

Traditionally, the Equal Protection Clause has been invoked when a fundamental right or a suspect class (*i.e.*, race or religion) is at stake. As noted above, the concept of the Fourteenth Amendment has expanded beyond those identifiable characteristics:

> It is not within our constitutional tradition to enact laws of this sort. Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities. . . . Respect for this principle explains why

laws singling out a certain class of citizens for disfavored legal status or general hardships are rare. A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. The guaranty of equal protection of the laws is a pledge of the protection of equal laws.

*Romer v. Evans,* 517 U.S. 620, 633-34 (1996) (internal citations and quotation marks omitted).

The inclusive nature of the Fourteenth Amendment embraces both "class-of-one" discrimination and other plaintiffs who may find themselves within a discrete group of citizens who have been targeted and outside the kin of a suspect class, such as the homosexual plaintiffs in *Romer.* But under *Romer* and other related equal protection cases, it may be far fetched to say that all property owners within a county who are subjected to the same constitutional county-wide policy constitute a discriminated class. There is no demonstration in the record that such a class of persons actually exists.

Under the most liberal construction, the facts here are that a group of property owners, with the exception of one, were unable to redeem their property under the County's redemption policy. It would seem that Fortunatus is reaching into the "murky corner of equal protection law" to say that this group should be compared not with similarly situated individuals, but with one individual, whose efforts distinguish himself from all of the others. *Bizzarro v. Miranda*, 394 F.3d at 86. But, even if that

comparison is appropriate, no facts were presented to show that all of those property owners were sufficiently similarly situated to Liberty as outlined above. Under this scenario, it would seem that the correct equal protection critique is the "class-of-one," *see supra* Part II.B.2, and not class membership. The Court will proceed nonetheless.

Over the years within this Circuit, there has been a significant debate as to whether this type of claim advocated by Fortunatus is just another "class-of-one" claim with a very stringent burden, or more descriptively called selective enforcement claims that require a lesser burden. *See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679 (S.D.N.Y. 2011) (analyzing in depth case precedents as to whether both concepts were of the same mixed bag, or ripe with distinctions generating different burdens of proof); *Vaher v. Town of Orangetown, New York*, 2013 WL 42415, at n. 37 (S.D.N.Y. Jan. 3, 2013) (noting the disagreement within the Second Circuit as to the degree of similarity that a plaintiff must show with a comparator under a similar theory). Those courts that have identified selective enforcement contexts differently from the "class-of-one" claims have applied a "slightly less stringent similarly situated standard;" that is, "plaintiffs claiming selective enforcement must compare themselves to individuals that are 'similarly situated in all material respects.'" *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*,

815 F. Supp. 2d at p. 696 (citation omitted).[25]   Although this Court does not understand the subtle distinction between "extreme high degree" and "all material respects" nor am I prepared to embrace this delineation as a seminal principle of law, I will presume, *arguendo*, that this case does constitute a selective enforcement case and will consider this lesser standard.   Even applying this lesser standard, Fortunatus's claim, under this theory, fails as well.

Fortunatus's conclusory statements that Liberty was similarly situated with all other property tax payers is taken out of context.   At the moment of the tax foreclosure order, all of them may have been similarly situated.   However, because of Liberty's exceptional effort to gain the return of his property that no other tax payer, including Fortunatus, pursued, except Russell Pray, there is a rather compelling suggestion that they are not similarly situated.   In this regard, Justice McGill removed only Liberty's property from the public auction that occurred on June 2, 2011, after he was the only property owner to seek such relief.   While a compromise was being pursued with the Legislature, only Liberty's Article 78 petition, seeking to circumvent the County's reconveyance policy for yet another policy under Real Property Tax Law § 1166, remained pending.   No other taxpayer can boast of similar circumstances.   Liberty

_____

[25] Presumably to understand these distinctions, a "class-of-one" claim connotes selective treatment while alleged discrimination against a larger group implies selective enforcement.

persistently attended legislative meetings to strike an accord on the return of his property. Only Russell Pray pursued a similar course. Unlike the plaintiffs in *Mosdos Chofetz Chaim*, Fortunatus has not presented any credible evidence that either he or the other property owners who lost their property were similarly situated to Liberty. In this regard, all of these tax payers are not similarly situated in all material respects to Liberty, and no reasonable jury could find that there is a reasonably close resemblance of the facts and circumstances between Fortunatus and the other property owners with the comparator Liberty.[26] And, even if the Court was to find that they are similarly situated, no reasonable jury could find that implementation of such policy enforcing the redemption deadline that affected dozens of property owners was based upon an intent to discriminate against this class, laden with impermissible considerations, interfered with an expressed constitutional right, or constitutes invidious discrimination. *LeClair v. Saunders*, 627 F.2d 606, 611 (2d Cir. 1980); *see also Soberal-Perez v. Heckler*, 717 F.2d 36, 42 (2d Cir. 1983) (citing *Arlington*

---

[26] This Court appreciates zealous advocacy but here Fortunatus reaches too far. It is not fair commentary to say that Defendants "falsely told [these taxpayers] that their only remedy was to bid on their former property at the tax auction," when that was the County's actual policy at the time. Pl.'s Mem. of Law at p. 22. Fortunatus knows, or should know, that the County Treasurer's Office was merely advising these taxpayers of the policy at that time, so it could not be deemed a fabrication. And, insistent claims that Liberty and Defendants had a "secret deal," *id*. at p. 23, are defied by the substantial record. It is unclear if Liberty actually appeared in an executive session of the Legislature, but when there are discussions regarding proposed, pending or current litigation - Liberty's Article 78 would suffice - a governmental body can go into closed session, without it being nefarious. N.Y. PUB. OFF. L. at § 105(1)(d); *see also Kline & Sons v. Cnty. of Hamilton*, 225 A.D.2d 44 (N.Y. App. Div 3d Dep't 1997) (discussing the parameters of an executive session).

*Heights v. Metro. Hous. Corp*., 429 U.S. 252, 265-70 (1977) & *Washington v. Davis*, 426 U.S. 229, 240-42 (1976) discussing what constitutes invidious discrimination)).

### C. Due Process

Fortunatus claims that the Defendants deprived him of due process by denying him a "hardship hearing" before the Legislature or because they did not have a written policy regarding reconveyance of tax acquired property. This cause of action fails on numerous accounts, foremost being that he is estopped from claiming entitlement to a "hardship hearing." In Fortunatus's Article 78 proceedings, Justice Muller emphatically ruled that the Defendants "have no duty to hold a hardship hearing . . . . and are not required to permit redemption after the [foreclosure] deadline." Dkt. No. 42-24, Ex. W., Art. 78 Dec. & Order at p. 5 & 7; *see also supra* Part II.A. In addition to being estopped from raising this issue, there are other reasons to reject this due process claim.

It is settled federal law within this Circuit that counties, especially Clinton County, do not violate any constitutional right because they refuse to reconvey property after the foreclosure deadline, a point of law Fortunatus must concede. *Miner v. Clinton County,* 541 F.3d 464, 474-75 (2d Cir. 2008); Pl.'s Mem. of Law at p. 16. Even though Real Property Tax Law § 1166 gives county legislatures the

authority to sell and convey the tax-acquired property, said authority is discretionary and not mandatory. *Belardo v. City of Schenectady*, 28 A.D.3d 986, 988 (N.Y. App. Div. 3d Dep't 2006) (noting that under this provision of law, there is no limitation on the municipalities' discretion to dispose of tax-acquired property). In fact, Fortunatus cannot cite to any statute or case precedent that mandates such a result. Nor can Fortunatus cite or identify any statute that requires a county legislature to hold what amounts to a "hardship hearing."

Official actions, which are purely legislative in nature, are not subject to the hearing requirements of the due process clause. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 174 (2d Cir. 2005). However, because § 1166 grants discretionary authority, such action may be deemed adjudicative and thus subject to due process requirements. "Proceedings that adjudicate disputed facts in a particular case are subject to the requirements of procedural due process." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 143 (2d Cir. 1994) ("The test for determining whether official action is adjudicative or legislative focuses on the function of the decisionmaker.") (citation omitted); *Toussie v. Cnty. of Suffolk*, 806 F. Supp. 2d at 581-82 (noting that legislative action is adjudicative when determining facts about parties and their activities or properties). And for there to be a violation, the evidence must show that they acted arbitrarily or "conscience-shocking in a constitutional

sense." *Interport Pilots*, 14 F.3d at 144.

Fortunatus proffers the notion that the Legislature acted in a adjudicative capacity when he was told that such a "hardship hearing" was not available. In order to advance this proffer, Fortunatus has to assign culpability to Legislator Rowden for not only explaining the policy to him but for being the final arbiter as to whether Fortunatus would receive an opportunity to address the entire Legislature. The record shows otherwise. Fortunatus further extrapolates that because they had no "real policy regarding reconveyance," they have refused to even consider exercising their discretion or, that their policy constituted a blanket denial and thus not an exercise of their discretion. Pl.'s Mem. of Law at pp. 33-34. But the failure to reduce its reconveyance policy into writing, or the fact that most counties within New York allow reconveyance, does not constitute an adjudicative function nor contravenes the due process clause. *Miner v. Clinton Cnty.*, 541 F.3d at 474 ("The fact that other counties may allow redemption after judgment is insufficient to sustain [] equal protection [and due process] claim[s] against Clinton County.").

In any event, because Fortunatus did not present his claim before the Legislature, they did not act in an adjudicative manner toward him. If their actions were adjudicatory in any way, it occurred when they addressed Liberty's importunes. Such a legislative act is presumed valid and must be upheld if it is rationally related

to a legitimate governmental objective, *Interport Pilots*, 14 F.3d at 145, and this Court has already recognized Defendants' policy, under these circumstances, was reasonable, racially neutral, and legitimate. Conversely, Defendants' policy and their actions consistent with those policies are neither arbitrary nor conscience shocking. Even if the Court was to find that the Defendants had erred, "erroneous government action alone does not give rise to a constitutional violation." *Lyn v. Inc. Vill. of Hempstead*, 308 F. App'x 461, 465 (2d Cir. 2009) (quoting *Interport Pilots*, 14 F.3d at 145). Stated another way, "a reasonable, though arguably, incorrect interpretation of the [] regulations," is not deemed to be arbitrary or irrational such that it would provoke a constitutional violation. *Padberg v. McGrath-Mckechine*, 60 F. App'x 861, 862-63 (2d Cir. 2003). And neither a subsequent state court ruling nor a change in the policy as to when property can be redeemed, going forward, can render the Legislature's initial action two years prior arbitrary, capricious or conscience shocking. *See* Dkt. Nos. 50, Pl.'s Lt., dated Jan. 24, 2013, & 51, Defs.' Lt., dated Jan. 30, 2013;[27] *see supra* note 23 (discussing *Pray v. Clinton Cnty.*).

Under these circumstances, and for all of the reasons previously stated, there is no demonstration that an actual deprivation of due process occurred, and

---

[27] Fortunatus's Letter was filed after the close of the record. Normally, this belated filing would be excluded, however, it has no intrinsic value to our discussion other than what is provided above.

accordingly, no reasonable jury could find that Fortunatus's due process rights were violated.

### D.  Qualified Immunity

Giroux has pled as an affirmative defense of qualified immunity which is raised again in their Motion.  The doctrine of qualified immunity protects governmental officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Messerschmidt v. Millender*, _ U.S. _, 132 S.Ct. 1235, 1244 (2012).  Qualified immunity gives governmental officials  "breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law."  *Ashcroft v. al-Kidd*, _ U.S. _, 131 S.Ct. 2074, 2085 (2011) (citation omitted); *Jackler v. Byrne*, 658 F.3d 225, 243 (2d Cir. 2011) (Making "a mere mistake in the performance of an official duty may not deprive the office of [this] defense.").  Determining whether qualified immunity may apply is a two prong inquiry: (1) whether the official violated a statutory or constitutional right; and (2) and whether the right was clearly established at the time of the challenged conduct.  *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012).  Recently, the United States Supreme Court relieved courts from having to decide sequentially the more difficult question of whether the facts alleged or shown by plaintiff make out a

violation of a constitutional right before determining whether the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that the protocol mandated in *Saucier v. Katz*, 533 U.S. 194 (2001) should not be regarded as an inflexible requirement, but may be considered if a court wishes). With the rigid *Saucier* procedure being alleviated, courts now have the discretion to decide which of the two prongs of this analysis "to tackle first." *Coollick v. Hughes*, 699 F.3d at 219.

In order for a constitutional right to be clearly established, it must be defined with reasonable specificity, as established by both Supreme Court and Second Circuit law, and sufficiently clear that a reasonable official would have understood that the conduct at issue is unlawful under the existing law. *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (citations omitted); *Reichle v. Howards*, _ U.S. _, 132 S.Ct. 2088, 2093 (2012). Clearly established is "not a broad general proposition . . . but in a particularized sense so that the contours of the right are clear to a reasonable official," and that existing precedents have placed it "beyond debate." *Reichle v. Howards*, 132 S.Ct. at 2093 & 2094; *Hope v. Pelzer*, 536 U.S. 730, 753 (2002) ("The contours of the right must be sufficiently clear that a reasonable official would have understood that what he is doing violates that right.") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). If the conduct does not violate a clearly established constitutional right,

or, "if it was objectively reasonable for the official to believe that his conduct did not violate such a right, then the official is protected by qualified immunity." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (citation omitted). Or, conversely, if officers of reasonable competence could disagree that such conduct was unlawful, then qualified immunity should be recognized. *Hope v. Pelzer*, 536 U.S. at 752 (quoting *Malley v Briggs*, 475 U.S. 335, 341 (1986)).

As a general proposition of law, when performing discretionary functions, a governmental official is keenly shielded from civil damage liability because their conduct rarely violates clearly established constitutional rights of which a reasonable person would have known. *Anderson v. Creighton*, 483 U.S. at 638 (noting that courts "generally provide[] government officials performing discretionary functions with qualified immunity . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated"); *Looney v. Black*, 702 F.3d at 705 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Officials are not liable for bad guesses in gray areas; they are liable for transgessing bright lines." *Coollick v. Hughes*, 699 F.3d at 221.

In applying this defense, Giroux would be entitled to qualified immunity. Although the Court has earlier found that there is no constitutional violation, obviating the need for an analysis under the second prong, the Court also finds that the

constitutional violations that Fortunatus claims to have occurred were not clearly established in any event. In fact, neither the Supreme Court nor the Second Circuit has announced either a due process or equal protection right under the circumstances presented by Fortunatus.

Briefly, Giroux, as a reasonable official, would not have reasonably known that adhering to and enforcing the County's long-held policy that no reconveyance would occur after the redemption deadline violated the particularized contours of a clearly established constitutional right. Actually, Giroux's and the County's views at the time of the alleged occurrences were acceptable discretionary functions under New York Real Property Tax Law. *See supra* note 8. All agree that New York Real Property Tax Law § 1166 granted discretionary authority to county legislatures to allow private sales of tax-acquired properties. Such discretionary authority, either to grant or to refuse, would invariably invoke qualified immunity, even if it was mistakenly applied. Giroux would not have known that refusing to reconvey Fortunatus's property or pay him the value of his property after it was already sold at a public auction would have violated any clearly established constitutional right. Nor would he have known that settling a lawsuit with Liberty that caused the re-purchase of his property and then denying Fortunatus the same ability, especially four months hence, violated any clearly established principles of equal protection. Lastly, neither Giroux nor any

member of the County Legislature would reasonably have known that there is such a creature as a "hardship hearing," given that there is none pursuant to New York law, or that not giving specific instruction to a property owner as to how he could address the Legislature about his tax foreclosure issue would violate either the due process or equal protection clause. "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in a defendant's position should know about the constitutionality of the conduct." *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). Such previous conduct has not been found constitutionally unlawful. Giroux's actions and decisions were not objectively unreasonable in light of the law existing at the time of his conduct. Similarly, county treasurers in New York of reasonable competence would not disagree that Giroux's conduct here would have violated any established constitutional right. Accordingly, no reasonable jury could conclude that it was objectively unreasonable for Giroux, or any other County official,[28] "to believe that he [or they were] acting in a fashion that did not clearly violate an established federally protected right." *Bonide Prods., Inc. v. Cahill*, 223 F.3d 141, 145 (2d Cir. 2000) (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)).

---

[28] Had County Legislators Rowden, McManus, and Trombley been named as parties, this Court would find that they too are entitled to qualified immunity insofar as they would not have known that their decisions, even if mistaken, violated clearly established constitutional rights.

# IV. CONCLUSION

For all of the reasons stated above, Fortunatus has failed to demonstrate either a due process or equal protection violation, and no reasonable jury could conclude from these facts that he has stated such a claim. Moreover, Fortunatus is collaterally estopped from presenting any facts regarding the denial of due process or equal protection violations because of Justice Muller's previous decision and order on these very issues, issues which were fully and fairly litigated. Furthermore, even if a constitutional violation was found, Giroux would be entitled to qualified immunity. All other issues raised by Fortunatus are without merit. Accordingly, it is hereby

**ORDERED**, that Defendants' Motion for Summary Judgment, Dkt. No. 42, is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's Cross-Motion for Summary Judgment, Dkt. No. 46, is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court shall file a Judgment consistent with this Memorandum-Decision and Order.

**IT IS SO ORDERED**.

April 4, 2013
Albany, New York


Randolph F. Treece
U.S. Magistrate Judge